**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF OKLAHOMA**

LINDA G. MARTIN-BEST,                                    )
                                                         )
                          Plaintiff,                     )
                                                         )
vs.                                                      )          Case No. 10-cv-397-TLW
                                                         )
MICHAEL J. ASTRUE,                                       )
Commissioner of the Social Security                      )
Administration,                                          )
                                                         )
                          Defendant.                     )

**OPINION AND ORDER**

Lisa G. Martin-Best ("plaintiff") requests judicial review pursuant to 42 U.S.C. § 405(g)

of the decision of the Commissioner of the Social Security Administration ("Commissioner")

denying plaintiff's applications for disability insurance benefits and supplemental security

income under the Social Security Act, 42 U.S.C. §§ 401 *et seq.* Both parties have consented to

proceed before a United States Magistrate Judge. Plaintiff appeals the decision of the

Administrative Law Judge ("ALJ") and asserts that the Commissioner erred because the ALJ

incorrectly determined that plaintiff was not disabled. For the reasons discussed below, this

Court REMANDS the decision of the Commissioner.

**Background**

At the time of her hearing before the ALJ on June 2, 2008, plaintiff was 47 years old. (R.

22). Plaintiff obtained her GED in 1979 (R. 23) and received vocational training to become a

home health aide in 1995. (R. 24). Plaintiff testified that she injured her back in December of

2005 while working as a home health aide and lifting a wheelchair for a patient. Because of her

injury, plaintiff testified that her "back condition limited [her] to not be able to work," and

caused her a great deal of "pain, numbness, and stiffness." (R. 24). After her injury in

December of 2005, plaintiff worked "maybe eight hours a week" (R. 24) and was placed on medical leave by her employer, Gentiva Health Services, after her condition worsened. (R. 25). In the 15 years prior to her injury, plaintiff worked as a cook, kitchen helper, home health aide, cashier, and salesperson. (R. 108).

After being placed on medical leave, plaintiff testified her primary care physician, Dr. Bret Gray, M.D. ("Dr. Gray") told her "that I need microdiscectomy and that it wouldn't help - - [the doctor] couldn't guarantee that it would help at all." (R. 25, 174). Plaintiff did not receive the surgery because she could not afford it, and Cherokee Nation Health Services denied her medical. (R. 25). She continued to take her prescribed pain pills and anti-inflammatories which helped "[s]omewhat. They don't completely get away my pain though." (R. 25). Dr. Gray then referred plaintiff to a neurosurgeon, Dr. Ronald E. Woosley, M.D. ("Dr. Woosley"), who also opined that plaintiff needed microdiscectomy surgery on her back. (R. 26).

During her hearing before the ALJ, plaintiff described her symptoms as "numbness, stiffness in the back of my leg. I get leg cramps, Charley horses, spasms. I can't sleep good at night. It radiates down the bottom of my foot and it tingles and numbs." (R. 26). She alleged the symptoms affected her to where "I can't walk. I can't stand. I can't sit. I can't lie. I can't work." (R. 26). Plaintiff mentioned she could only sit or stand for 15-20 minutes at a time before needing to change her position and had problems with bending, stooping, and kneeling. Plaintiff stated she needed to lay down with a heating pad three to four times per day for at least 15-30 minutes. (R. 26-30). Plaintiff stated she had no problems with her neck, shoulders, arms, hands, grip strength, and feeling with her hands and that all her problems were related to her lower back. (R. 31). She said she was able to lift five pounds without hurting herself, had no problems reaching above her head, and was able to take care of household chores such as dusting

and vacuuming, but not mopping. (R. 32). Plaintiff also mentioned she had "mild anxiety attacks" and took medication prescribed by Dr. Gray. She described her anxiety as "I get short of breath, nervous. Don't want to go outside. Don't want to be around people. Don't like groups," and claimed the anxiety was caused by "[m]y nerves I guess." (R. 33).

A vocational expert, Shara Mao ("Mao"), also testified at the hearing. The ALJ asked Mao: "We have an individual who can't complete an[] eight-hour day five days a week. Does that eliminate all competitive work?" (R. 34). Mao opined plaintiff's inability to complete an eight-hour day five days a week eliminated all competitive work. (R. 34-5). This was the end of the hearing, which lasted a total of 19 minutes.

Over the course of her injury, plaintiff had two treating physicians: Dr. Gray and Dr. Woosley. The relevant portions of the treating physicians' medical records are summarized below.

On December 29, 2005, plaintiff visited Dr. Gray and complained of low back pain. (R. 184). Dr. Gray prescribed Ibuprofen for the pain and sent plaintiff home. (R. 184). Approximately one week later, plaintiff visited Dr. Gray again for her lower back pain, and Dr. Gray noted that "Pain rates @ 10" and "L[eft] SLR (straight leg raising) is difficult - unable to perform." (R. 183). Dr. Gray then prescribed Tramadol and Naproxen for the pain. (R. 183). Plaintiff continued to struggle with lower back pain and received an MRI on January 26, 2006. On January 30, 2006, Plaintiff was referred to an orthopedic neurosurgeon. (R. 199).

Plaintiff continued to struggle and on February 9, 2006, plaintiff visited Dr. Gray again who noted plaintiff had not shown any improvement and "none of [plaintiff's] current meds, including Darvocet, relieves the pain." (R. 182, 198). Approximately one month later, plaintiff visited Dr. Woosley, an orthopedic neurosurgeon, who recommended plaintiff for a

"microdiscectomy due to an S1 radiculopathy left secondary to herniated nucleus pulposis." Dr. Woosley also noted the SLR test was positive [for pain] on the left. (R. 180).

On March 28, 2006, plaintiff called Dr. Gray to request a refill for her pain medication. Dr. Gray advised plaintiff that she still had a prescription to fill, but plaintiff stated she had filled the prescription already and only had 3 pills left. (R. 197). Plaintiff also called Dr. Gray's office to request a refill for her pain medication on June 27 and July 25, 2006. (R. 189-90).

In August of 2006, Dr. Gray wrote a note to an undisclosed recipient and stated that "[plaintiff] has a herniated L5-S1 disk. She needs to have a microdiscectomy. Due to the back pain she has only been able to work 3 hours per week . . . and has filed for disability." (R. 185). After filing for disability, plaintiff visited Judy Marks-Snelling, D.O., M.P.H. on October 20, 2006. Dr. Marks-Snelling conducted a Physical Residual Functional Capacity Assessment ("RFC") with the primary diagnosis listed as Lumbar Radiculopathy. For section A, Exertional Limitations, Dr. Marks-Snelling noted that plaintiff could occasionally lift and/or carry 20 pounds, plaintiff could frequently lift or carry 10 pounds, plaintiff could stand and/or walk (with normal breaks) for a total of about 6 hours in an 8 hour workday, plaintiff could sit (with normal breaks) for a total of about 6 hours in an 8-hour workday, and plaintiff could push or pull for an unlimited time, other than as shown for lift and/or carry. (R. 248). Dr. Marks-Snelling noted the RFC was based on plaintiff's consultative examination where she had 70/90 degrees of flexion to her spine, negative SLR tests, and pain and tenderness of her lower spine; "all other range of motion was without any limitation." (R. 248). Plaintiff's gait was described as "slow with minimal limp to the left, secondary to back pain" and plaintiff was able to toe and heel walk (ambulate) normally. Plaintiff's activities of daily living showed she performed some light housework, bathed, cooked, shopped, and drove. (R 248). The report also found plaintiff

frequently had postural limitations when balancing, kneeling, crouching, and crawling, and occasionally had postural limitations when climbing ramps and stairs and while stooping. (R. 249). However, plaintiff was not found to have any manipulative, visual, communicative, or environmental limitations (R. 249-52), and there were no treating or examining source statement(s) regarding the plaintiff's physical capacity in the file. (R. 253). The RFC test of October 20, 2006 was later affirmed on April 10, 2007. (R. 273).

Dr. Gray examined plaintiff again on November 27, 2006 and noted "the Lortab relieve the pain." (R. 257). Plaintiff had another MRI of her back taken on December 4, 2006 and Dr. Gray noted plaintiff's condition had improved some but still had significant abnormality. (R. 281). Plaintiff then returned to work part-time and earned $481 during the first quarter of 2007. (R. 94).

By March 26, 2007, plaintiff still had not received surgery. As a result, Dr. Gray wrote a note that "[Plaintiff] has a herniated nucleus pulposis . . . Due to this medical condition, she is not able to work full time. She is awaiting surgical correction of this problem." (R. 269). Lynn Loghry, RN MCP then wrote a letter to "whomever it may concern" that plaintiff "was placed on medical leave as of 3/31/07. She will remain on leave until she has obtained a release from her Physician stating that she can return without restrictions." (R. 272). One week later Dr. Woosley noted plaintiff's "symptoms had improved to some degree and the defect had diminished as well as her symptoms." (R. 294).

In May, Dr. Gray noted it was still unclear when plaintiff could return to work. (R. 278, 290). Then, after a visit on June 12, 2007, Dr. Gray indicated plaintiff would be able to return to work in 3 months. (R. 277). One month later plaintiff visited Dr. Woosley who gave plaintiff a work release for full duty. (R. 293). In his letter releasing plaintiff for full work duty, Dr.

Woosley noted "the back pain is worse… Her defect had decreased in size. She had Degenerative Disc Disease. . . Her examination showed no focal deficit. I recommended a trial of epidural steroid injection… We have given her a work release for full duty." (R. 293).

Plaintiff visited Dr. Gray again in October and told him her back "was still tolerable" and that she could function on Mobic and 2 Lortabs per day. Plaintiff also had "[zero] interest in surgery." (R. 323, 330). In December of 2007, plaintiff visited Dr. Gray again, and he noted plaintiff's back condition only prevented her from working full time. (R. 288).

On April 21, 2008, Dr. Gray recommended anti-inflammatories, exercises, and pain medications as treatment for plaintiff's back problems as opposed to surgery. In response to the question, "Does this condition prevent the patient from working?" Dr. Gray noted "She reports that it does." To the question "Is the patient able to work at this time?" Dr. Gray replied "She reports that she cannot." (R. 287). One week later, Dr. Gray noted plaintiff told him Lortabs worked fine for her back.

On June 30, 2008, Dr. Woosley noted plaintiff still had some difficulty with her back and leg pain but her exam showed no focal deficit and there was no sensory loss or motor problems. (R. 355). Plaintiff received another MRI exam and on December 7, 2009, the MRI revealed significant pathology at the L5-S1 level. (R. 357). One week later, Dr. Gray noted that plaintiff's condition prevented her from working and plaintiff could return to work in 6 months. (R. 356).

Plaintiff also alleged anxiety as an impairment. Medical records showed Dr. Gray prescribed anxiety medications beginning on August 7, 2003. (R. 175). Dr. Gray refilled plaintiff's prescription for anxiety medication on a periodic basis. During numerous visits to Dr. Gray, anxiety was listed as a purpose for the visit but there were never any treatment notes

concerning anxiety from either treating physician. (R. 211, 212, 213, 257, 274, 276, 312, 324, 340, et al.).

In an interview with the State of Oklahoma Disability Determination Division on September 30, 2006, Dr. Ravinder R. Kurella, M.D. stated that "[plaintiff] gives a history of anxiety, which started about 3 years ago. She is in a bad relationship with her friend and is anxious secondary to that. She denies any depression or suicidal ideation. (R. 227). In that same report, Dr. Kurella found plaintiff had full range of motion of her neck, bilateral knee and hip joints, ankle joints, legs, shoulder, elbow, and wrist joints and the straight leg raising test was negative [for pain] both sitting up and lying down. (R. 228)

Dr. Sally Varghese, M.D. also conducted a Psychiatric Review Technique form on October 20, 2006. (R. 232-246). For category 1(B), Dr. Varghese noted plaintiff had a medical disposition as "Impairment(s) not severe." (R. 233). For category 12.06, Dr. Varghese noted plaintiff had "Anxiety-Related Disorders." (R. 233). Under category 12.06, Dr. Varghese found plaintiff had no motor tension, no autonomic hyperactivity, no apprehensive expectation, and no vigilance and scanning. Also, there was no persistent irrational fear of a specific object, no recurrent severe panic attacks, or any other fulfillment of the required criteria. (R. 238). The only evidence of a finding of anxiety was a check mark in the box which stated "a medically determinable impairment is present that does not precisely satisfy the diagnostic criteria above." Under the disorder "anxiety" was listed. (R. 238). Plaintiff was also evaluated as having no functional limitations; no restriction of activities of daily living, no difficulties in maintaining social functioning, no difficulties in maintaining concentration, persistence, or pace, and no episodes of decompensation. (R. 243). In Dr. Varghese's notes, she stated "Exam dated 4/19/06 her treating physician gives a diagnosis of anxiety. The plaintiff only reports taking Lortab for

her back pain. There is no evidence of treatment for anxiety or other mental health problems in the file. Activities of Daily Living are limited due to her physical condition . . .." (R. 245).

## Procedural History

On July 21, 2006, plaintiff filed a Title II application for disability and disability insurance benefits. On that same date, plaintiff also filed a Title XVI application for supplemental security income. In both applications, plaintiff alleged disability beginning December 29, 2005. Both claims were initially denied on October 20, 2006 and were again denied upon reconsideration on April 11, 2007. On April 20, 2007, plaintiff filed a written request for a hearing and the hearing was granted and held on June 2, 2008 in Tulsa, Oklahoma by administrative law judge ("ALJ") Lantz McClain. On July 31, 2008, the ALJ found the plaintiff was not disabled during the period of December 29, 2005 through July 31, 2008. Plaintiff then appealed to the Social Security Administration Appeals Council, which, on April 20, 2010, denied review of the ALJ's decision. Plaintiff then appealed to the United States District Court for the Northern District of Oklahoma, and both parties have consented to proceed before a United States Magistrate Judge. (Dkt. # 9).

## Standard of Review and Social Security Law

Disability under the Social Security Act ("SSA") is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment." 42 U.S.C. § 423(d)(1)(A). A plaintiff is disabled under the SSA only if her "physical or mental impairment or impairments are of such severity that she is not only unable to do her previous work but cannot, considering her age, education, and work experience, engage in any other kind of substantial gainful work in the national economy." 42 U.S.C. § 423(d)(2)(A). Social Security Regulations require a five-step sequential evaluation process to evaluate a

disability claim, and "[i]f a determination can be made at any of the steps that a plaintiff is or is not disabled, evaluation under a subsequent step is not necessary." 20 C.F.R. §§ 404.1520, 416.920. <u>See also</u> <u>Williams v. Bowen</u>, 844 F.2d 748, 750-753 (10th Cir. 1988) (detailing steps).

This Court's review is limited to determining whether the record as a whole contains substantial evidence supporting the Commissioner's decision and whether the proper legal standards were applied. <u>See</u> 42 U.S.C. § 405(g); <u>Hamilton v. Sec'y of Health & Human Servs.</u>, 961 F.2d 1495, 1497-1498 (10th Cir. 1992). "Substantial evidence is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." <u>Castellano v. Sec'y of Health & Human Servs.</u>, 26 F.3d 1027, 1028 (10th Cir. 1994). Substantial evidence must be "more than a mere scintilla." <u>Broadbent v. Harris</u>, 698 F.2d 407, 414 (10th Cir. 1983) (per curiam) (citations omitted). Although a reviewing court cannot weigh the evidence and may not substitute its discretion for that of the agency, it nevertheless has the duty to meticulously examine the record and make its determination on the record as a whole. <u>Castellano</u>, 26 F.3d at 1028. In this inquiry, the Court may "neither reweigh the evidence nor substitute our judgment for that of the agency." <u>Id.</u>

## <u>Decision of the Administrative Law Judge</u>

Step 1 of the sequential evaluation process required plaintiff to establish that she was not engaged in substantial gainful activity as defined in 20 C.F.R. §§ 404.1510, 416.920. In this case, the ALJ found plaintiff had not engaged in substantial gainful activity since December 29, 2005. (R. 12) (alleged onset date). Step 2 required plaintiff to establish that she had a severe medically determinable impairment or impairments that caused limitation(s) having more than a minimal effect on her ability to perform basic work activity. 20 C.F.R. §§ 404.1520(c), 416.920(c). Here, the ALJ found the plaintiff had the following severe impairment:

"degenerative disc disease, history of breast cancer, and high blood pressure." Also, "an MRI dated December 4, 2006 indicated that the plaintiff had a large extradural defect at 5-1, significantly improved but with residual. There was a central protrusion with annular tear." (R. 12) (referring to an MRI of plaintiff's lower back).

At Step 3, plaintiff's impairment was compared with a list of impairments in 20 C.F.R. Pt. 404, Subpt. P, App.1 ("Listings"). If plaintiff's impairment(s) were listed in the listings, or if the impairment was "medically equivalent" to a listed impairment, then plaintiff should be determined to be disabled without further inquiry. In this case, the ALJ found plaintiff "does not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 C.F.R. Pt. 404, Subpt. P, App.1 …." (R. 12). Step 4 of the sequential evaluation process required plaintiff to establish that she did not retain the residual functional capacity ("RFC") to perform her past relevant work. Residual functional capacity is the most the plaintiff can do on a sustained basis despite the limitations caused by her medically determinable impairment(s). Here, the ALJ found "the plaintiff has the residual functional capacity to lift, carry, push, or pull 10 pounds occasionally and less than 10 pounds frequently; stand or walk 2 hours in an 8-hour workday; and sit 6 hours in an 8-hour workday as defined in 20 C.F.R. 404.1567(a) and 416.967(a)." (R. 13).

At Step 4 the ALJ also found plaintiff was unable to perform her past relevant work. Plaintiff worked as a home health aide, cashier, cook, and short order cook at the medium and light exertional levels. With an RFC for sedentary work, the ALJ concluded that plaintiff is unable to perform past relevant work at the medium and light exertional level. Because plaintiff's Step 4 burden was met, the burden shifted to the Commissioner at Step 5 to establish

that work existed in significant numbers in the national economy which plaintiff, considering her education, age, work experience, and RFC, could perform.

At Step 5 of the sequential evaluation process the ALJ determined plaintiff was not disabled. Based on plaintiff's RFC and taking into consideration plaintiff's age, education, and work experience, the ALJ found there were jobs that existed in significant numbers in the national economy that plaintiff could perform. Thus, a finding of "not disabled" was directed by the Medical-Vocational Rules. ("Grids") (R. 16).

## Issues

Plaintiff argues the ALJ erred in four respects:

(1) the ALJ failed at Step 5 of the sequential evaluation process because the ALJ mistakenly applied the Medical-Vocational Guides ("grids");

(2) the ALJ failed to perform a proper determination at Step 3 of the sequential evaluation process;

(3) the ALJ failed to perform a proper analysis of the treating physician's opinion; and

(4) the ALJ failed to perform a proper credibility determination.

(Dkt. # 15 at 2).

For analytical convenience, the second issue, alleging an error at Step 3, is considered first. Next, the third issue, alleging error in the ALJ's analysis of plaintiff's treating physician's opinion, is considered. The fourth issue is then considered, followed by the first.

## Discussion

### Step 3 Determination

At Step 3 of the sequential evaluation process the plaintiff's impairment is compared with a list of impairments in 20 C.F.R. Pt. 404, Subpt. P, App.1 ("Listings"). If a plaintiff's impairment is listed in the listings, or if the impairment is "medically equivalent" to a listed

impairment, the plaintiff is determined to be disabled without further inquiry. If the impairment is not listed or is not "medically equivalent" to a listed impairment, then the evaluation proceeds to Step 4 of the sequential evaluation process. Here, plaintiff claims she met or equaled Listing 1.04A. Listing 1.04A requires a disorder of the spine resulting in the compromise of a nerve root with:

> [e]vidence of nerve root compression characterized by neuro-anatomic distribution of pain, limitation of motion of the spine, motor loss (atrophy with associated muscle weakness or muscle weakness) accompanied by sensory or reflex loss and, if there is involvement of the lower back, *positive straight-leg raising test (sitting and supine).*

20 C.F.R. Pt. 404, Subpt. P, App. 1, § 1.04A (emphasis added).

Plaintiff claims she meets or equals Listing 1.04A because she has evidence of nerve root compression characterized by neuroanatomic distribution of pain, limitation of motion of the spine, motor loss with associated muscle weakness or muscle weakness accompanied by sensory or reflex loss, and her straight leg raising ("SLR") test was positive for pain or she was unable to perform them. (Dkt. # 15 at 4). The ALJ found plaintiff did not meet Listing 1.04A because the claimant had "negative leg raising at her consultative examination" and "there [was] no record of the above evidence required." (R. 13).

Listing 1.04A requires a positive straight leg raising (SLR) test. Plaintiff had a negative SLR test on September 30, 2006. (R. 228). On October 20, 2006 plaintiff could toe and heel walk normally. (R. 248). This result was affirmed on April 10, 2007. (R. 273). The listing in question also required motor loss accompanied by sensory or reflex loss. On July 25, 2007, plaintiff's exam showed no focal deficit. (R. 293). On June 30, 2008, Dr. Woosley, who was

plaintiff's treating physician, opined plaintiff had "no sensory loss or motor problems" and that her "[r]eflexes [we]re symmetrical . . .." (R. 355).[1]

As to plaintiff's positive SLR tests, these tests are not determinative. First, this Court may not reverse the ALJ's determination simply because there might be evidence supporting an opposite result. Oldham v. Astrue, 509 F.3d 1254, 1258 (10th Cir. 2007). Second, and more importantly, plaintiff's two positive SLR tests came soon after plaintiff's injury and failed to show plaintiff met the listing requirement for a 12 month period. The two positive SLR tests plaintiff occurred on January 9, 2006 (R. 183) and on March 6, 2006. (R. 180). The two positive SLR tests were administered less than 3 months after plaintiff became injured. The negative SLR test was administered on September 30, 2006 (R. 228), approximately 9 months after plaintiff became injured. Thus, plaintiff's positive SLR tests, in light of the subsequent negative test, were not probative of whether plaintiff met the listing.

Based on the foregoing, there was substantial evidence to support the finding by the ALJ that plaintiff did not meet or equal the listings.[2]

**Treating Physicians' Opinions**

Plaintiff alleged the ALJ erred by failing to provide a proper analysis of her treating physicians' opinions. Plaintiff argues: (1) the ALJ failed to consider all of the treating physicians' opinions regarding plaintiff's ability to work on a continuing and regular basis; (2)

---

[1] This evidence was introduced after the hearing and was accepted by the Commissioner on appeal. (R. 1).
[2] Also, 20 CFR 404, Subpt P, Appx 1, 1.00(B)(2) requires a loss of function that is defined as the inability to ambulate effectively on a sustained basis for any reason or the inability to perform fine and gross movements effectively, for at least 12 months. The inability to ambulate effectively "means an extreme limitation of the ability to walk." Generally, ineffective ambulation requires the use of a hand-held assistive device that limits the functioning of both upper extremities. Id. There is no evidence of plaintiff needing to use a handheld assistive device that limits the function of both her upper extremities.

the ALJ failed to determine if the treating physicians' opinions were due controlling weight; and (3) the ALJ gave faulty reasoning for his decision. (Dkt. # 15 at 5, 6).

A treating physician's opinions are generally given controlling or considerable weight in reviewing a disability claim when the opinion is "well-supported by medically acceptable clinical and laboratory diagnostic techniques" and is "not inconsistent with the other substantial evidence in [plaintiff's] case record." See 20 C.F.R. § 416.927(d)(2); Watkins v. Barnhart, 350 F.3d 1297, 1300 (10th Cir. 2003). Thus, an ALJ may disregard a treating physician's opinion if the opinion is inconsistent with other substantial evidence in the record or is not well-supported by medically acceptable techniques. Castellano v. Sec'y of Health & Human Servs., 26 F.3d 1027, 1029 (10th Cir. 1994). If the ALJ does not give controlling weight to a treating physician's opinion, the opinion is entitled to deference, and the ALJ must apply the factors listed in 20 C.F.R. § 416.927(d)(1)-(6) and "give good reasons" for the weight given. Id. These "good reasons" must be "sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's medical opinions." Watkins, 350 F.3d at 1300.

Finally, "if the ALJ rejects the [treating physician's] opinion completely, [the ALJ] must then give specific, legitimate reasons for doing so." Id. at 1301. The ALJ "may not make speculative inferences from medical reports and may reject a treating physician's opinion outright only on the basis of contradictory medical evidence and not due to his or her own credibility judgments, speculation or lay opinion." McGoffin v. Barnhart, 288 F.3d 1248, 1252 (10th Cir. 2002).

Aside from determining the proper weight to give a medical opinion, the ALJ is also required to "evaluate every medical opinion" he receives. 20 C.F.R. §§ 404.1527(d), 416.927(d).

See also Baker v. Bowen, 886 F.2d 289, 291 (10th Cir. 1989) (requiring ALJ to "consider all relevant medical evidence of record in reaching a conclusion as to disability"). More importantly, the ALJ must fully evaluate the evidence from plaintiff's treating physicians. Watkins v. Barnhart, 350 F.3d 1297, 1300 (10th Cir. 2003) (setting out framework for evaluating treating source medical opinions). The ALJ must also discuss the uncontroverted evidence he did not rely upon in his decision as well as any other significantly probative evidence that he rejected. See Frantz v. Astrue, 509 F.3d 1299, 1303 (10th Cir. 2007).

At Step 4 of the sequential evaluation process the ALJ determined plaintiff's subjective statements about her symptoms were not credible. As support for his reasoning, the ALJ referenced several inconsistencies between plaintiff's treating physicians' opinions and the plaintiff's own subjective statements about the intensity, persistence, and limiting effects of her symptoms. (R. 14-15). In finding these inconsistencies, the ALJ referred to Dr. Gray's medical opinions of March 26, 2007 and June 12, 2007 and Dr. Woosley's opinions of April 4, 2007 and July 25, 2007. These medical opinions were consistent with one another. However, there was also medical evidence from Dr. Gray and Dr. Woosley that a reasonable fact finder could find to be consistent with plaintiff's subjective statements along with a more recent medical opinion that the ALJ did not discuss at all. (R. 288). The ALJ should have discussed this medical evidence. On remand, he should do so.

Plaintiff also argues the ALJ failed to properly consider a "valid" April 21, 2008 medical opinion. (Dkt. # 17 at 2). If the treating physician's "opinion" of April 21, 2008 were in fact a medical opinion, plaintiff would be correct. However, there is no error because the ALJ was not required to afford the April 2008 "opinion" any weight as it was not a valid medical opinion. A medical opinion is an opinion that addresses the nature and severity of impairments. 20 C.F.R.

§§ 404.1527(d)(2), 416.927(d)(2).  The April 21, 2008 medical examination form in which Dr. Gray responded to the question "[d]oes this condition prevent the patient from working?" with "[s]he [plaintiff] reports that it does" and to the question "[i]s the patient able to work at this time?" with "[s]he reports that she cannot," did not address the nature and severity of impairments and was therefore not a valid medical opinion.  (R. 287).  Rather, the form simply quoted the plaintiff's statement, which is not the treating physician's opinion, and thus is not a valid medical opinion supported by medically acceptable techniques.  Therefore, this "opinion" was not entitled to controlling weight (or any weight for that matter), and the ALJ was not required to demonstrate how he weighed the source statement.  As such, any later comments the ALJ made regarding this "opinion" are not subject to the same standards as comments directed towards a valid medical opinion.

## **Credibility**

Plaintiff argues the ALJ failed to perform a proper credibility determination because:  (1) the ALJ did not properly follow the Luna factors in supporting his determination; (2) he improperly used plaintiff's activities of daily living as support for his decision; (3) he did not say which of claimant's testimony was true and which he rejected; and (4) the ALJ did not consider plaintiff's need for a recliner, heating pad, lying down, etc… as evidence of pain.  (Dkt. #15 at 7 -8).  In accordance with Luna v. Bowen, the ALJ must decide whether a claimant's subjective claims of pain are credible by considering factors such as "a claimant's persistent attempts to find relief for [her] pain and [her] willingness to try any treatment prescribed, regular use of crutches or a cane, regular contact with a doctor, and the possibility that psychological disorders combine with physical problems," as well as "the [plaintiff's] daily activities, and the dosage, effectiveness, and side effects of medication."   834 F.2d 161, 165-66 (10th Cir. 1987).

However, the ALJ is not required to make a "formalistic factor-by-factor recitation of the evidence." Qualls v. Apfel, 206 F.3d 1368, 1372 (10th Cir. 2000). Instead, the ALJ must only link his credibility findings with the evidence of record, rather than state his own conclusion. Kepler v. Chater, 68 F.3d 387, 391 (10th Cir. 1995).

Keeping in mind the foregoing, "[c]redibility determinations are peculiarly the province of the finder of fact, and we will not upset such determinations when supported by substantial evidence." Diaz v. Secretary of Health & Human Servs., 898 F.2d 774, 777 (10th Cir. 1990). However, "[f]indings as to credibility should be closely and affirmatively linked to substantial evidence and not just a conclusion in the guise of findings." Huston v. Bowen, 838 F.2d 1125, 1133 (10th Cir. 1988). See also Marbury v. Sullivan, 957 F.2d 837, 839 (11th Cir. 1992) (ALJ "must articulate specific reasons for questioning the claimant's credibility" where subjective pain testimony is critical).

The ALJ found plaintiff's subjective complaints of pain were not credible to the extent the statements were inconsistent with the residual functional capacity assessment and to the extent these statements conflicted with plaintiff's treating physician opinions, her work history, plaintiff's own statements, and her consultative examination. There was substantial evidence to support these findings. However, the ALJ did not affirmatively link all of these findings to specific evidence.

Plaintiff testified during her hearing on June 2, 2008 that her condition affected her as follows: "I can't walk. I can't stand. I can't sit. I can't lie. I can't work." (R. 26). The ALJ referenced this statement along with several other statements in making his credibility determination. (R. 14). As one of the reasons, the ALJ stated: "[plaintiff] has shown a weak work history." There is substantial evidence in the record that supports this conclusion but the

ALJ did not specifically link his findings with that evidence. The ALJ simply stated plaintiff "has shown a weak work history" without providing any evidence he relied upon to support his conclusion. This "conclusion in the guise of findings" must be supported by evidence in the record in order to be proper.[3]

Also, even though the ALJ was not required to make a "formalistic factor-by-factor recitation of the evidence," the ALJ did not properly evaluate "[plaintiff's] persistent attempts to find relief for [her] pain and [her] willingness to try any treatment prescribed . . . and the [plaintiff's] daily activities, and the dosage, effectiveness, and side effects of medication." Plaintiff provided probative evidence of her need for a recliner, heating pad, lying down, extensive use of pain medication, etc… as an attempt to find relief from her pain. (R. 26-30, 149, 150, 160, 183, 184, 257, 323, 330, et. al). In light of this potentially probative evidence that supported plaintiff's subjective allegations of pain, the ALJ was required to discuss why he chose to reject this evidence in determining the credibility of plaintiff's statements. See Clifton v. Chater, 79 F.3d 1007, 1010 (10th Cir. 1996). In Hardman v. Barnhart, 362 F.3d 676, 680 (10th Cir. 2004) the court held that, in assessing the credibility of a claimant's complaints of disabling pain, "[i]t was error for the ALJ to fail to expressly consider [plaintiff's] persistent attempts to find relief from [her] pain, [her] willingness to try various treatments for [her] pain, and [her] frequent contact with physicians concerning [her] pain-related complaints." Here, the record shows evidence of prescriptions and refills for pain medication, including narcotics as well as several other attempts by plaintiff to find relief from her pain. The ALJ should have

---

[3] SSR 96-7p. Under this ruling, a credibility determination "must contain specific reasons for the finding on credibility, supported by the evidence in the case record" and be "sufficiently specific" to inform subsequent reviewers of both the weight the ALJ gave to a claimant's statements and the reasons for that weight. Hayden v. Barnhart, 374 F.3d 986 (10th Cir. 2004) (quoting SSR 96-7p, 1996 WL 374186, at *4).

expressly considered this evidence in determining whether plaintiff's complaints of pain were credible.  <u>Sistler v. Astrue</u>, 410 Fed.Appx. 112 (10th Cir. 2011).  On remand, the ALJ should do so.

Plaintiff also argued the ALJ improperly relied upon plaintiff's activities of daily living ("ADL") as support for his credibility determination.  (Dkt. # 17 at 3).  This Court disagrees.  The only place in his ruling the ALJ mentioned plaintiff's ADL was in his Step 3 determination; the ALJ never mentioned plaintiff's ADL in his credibility determination and made no suggestions that he even considered them.  The ALJ only used plaintiff's ADL in Step 3 to refute allegations of anxiety as a severe and limiting mental impairment.  (R. 13).  Plaintiff's ADL were considered during plaintiff's psychiatric review as support for the finding that plaintiff had no functional limitations caused by her alleged mental disorder, (R. 243, 245) not to undermine plaintiff's credibility or to negate her disability claims.

Plaintiff further argues her minimal activities of daily living were not a negation of disability.  Plaintiff mentioned she performed some light housekeeping, light cooking, shopped, took care of personal needs, drove, and visited with neighbors.  She could pay attention and follow instructions well, get along well with authority figures, and handle changes in routine "OK."  (R. 13).  In supporting her argument, plaintiff cited several cases where each of the activities of daily living mentioned by plaintiff were not found to be indicative of the ability to perform substantial gainful activity.  However, plaintiff's reliance on those cases is misplaced, since the ALJ never used plaintiff's ADL to negate her claim of disability.

Furthermore, even if the ALJ did rely in part on plaintiff's ADL as a basis for his disability determination, it is the province of the ALJ to draw a reasonable inference that plaintiff's ADL taken together with other evidence in the record showed greater functioning than

plaintiff alleged.  <u>Gossett v. Bowen</u>, 862 F.2d 802, 807 (10th Cir. 1988); <u>Talbot v. Heckler</u>, 814 F.2d 1456, 1462-63 (10th Cir. 1987).  Such determinations are the responsibility of the ALJ, and this Court will not upset such determinations when supported by substantial evidence.

**<u>Use of the Medical-Vocational Guides</u>**

Plaintiff argues the ALJ mistakenly applied the "grids" (Medical-Vocational Rule 201.27) at Step 5 of the sequential evaluation process because the ALJ failed to properly consider plaintiff's nonexertional impairments of pain and anxiety.[4]  (Dkt. # 15 at 2).  "The grids contain tables of rules which direct a determination of disabled or not disabled on the basis of a plaintiff's RFC category, age, education, and work experience.  <u>See</u> 20 C.F.R. Pt. 404, Subpt. P, App. 2.  "Under the Secretary's own regulations, however, 'the grids may not be applied conclusively in a given case unless the plaintiff's characteristics precisely match the criteria of a particular rule.'" <u>Frey v. Bowen</u>, 816 F.2d 508, 512 (10th Cir. 1987) (quoting <u>Teter v. Heckler</u>, 775 F.2d 1104, 1105 (10th Cir. 1985) (other citations omitted)).  "The grids should not be applied conclusively in a particular case . . . unless the plaintiff could perform the full range of work required of that [RFC] category on a daily basis and unless the plaintiff possesses the physical capacities to perform most of the jobs in that range." <u>Hargis v. Sullivan</u>, 945 F.2d 1482, 1490 (10th Cir. 1991) (citing <u>Channel v. Heckler</u>, 747 F.2d 577, 580 (C.A. Colo. 1984)).  "Moreover, resort to the grids is particularly inappropriate when evaluating nonexertional limitations such as pain and mental impairments." <u>Hargis</u>, 945 F.2d at 1490 (citing <u>Channel</u> at 580-81).  In that case, "[t]he grids may serve only as a framework to determine whether

---

[4]  The ALJ's finding in Step 5 was:  "based on a residual functional capacity for the full range of sedentary work, considering the plaintiff's age, education, and work experience, a finding of 'not disabled' is directed by Medical-Vocational Rule 201.27."  (R. 16).

sufficient jobs remain within a plaintiff's range of residual functional capacity."  Id. (citing

Huston v. Bowen, 838 F.2d 1125, 1131 (10th Cir. 1988)).

However, it is important to note the mere presence of a nonexertional impairment does

not preclude reliance on the grids.[5]  Ray v. Bowen, 865 F.2d 222, 225 (10th Cir. 1989) (citing

Channel, 747 F.2d at 582 n.6).  Use of the grids is foreclosed only "[t]o the extent that

nonexertional impairments further limit the range of jobs available to the claimant."  Id. (quoting

Grant v. Schweiker, 699 F.2d 189, 192 (4th Cir. 1983)).  Thus, an ALJ may not rely conclusively

on the grids unless he finds:  (1) that the claimant has no significant nonexertional impairment;

(2) that the claimant can do the full range of work at some RFC level on a daily basis; and (3)

that the claimant can perform most of the jobs in that RFC level.  Each of these findings must be

supported by substantial evidence.  Thompson v. Sullivan, 987 F.2d 1482, 1488 (10th Cir. 1993).

Here, the ALJ conclusively applied the grids because he found plaintiff had no significant

nonexertional impairments and any other impairments she may have had did not limit the full

range of work or jobs available.  (R. 16).  Although this might have been the proper

determination, the ALJ needed to expressly consider plaintiff's subjective complaints of pain

---

[5]  See, e.g., Blacknall v. Heckler, 721 F.2d 1179, 1181 (9th Cir. 1983) (per curiam) (reliance on grids approved where substantial evidence supported ALJ's finding that claimant's psychiatric limitations did not significantly limit range of work permitted by exertional limitations); Odle v. Heckler, 707 F.2d 439, 440 (9th Cir. 1983) (evidence supported conclusion that nonexertional impairments would not significantly limit claimant's exertional abilities); Hernandez v. Heckler, 704 F.2d 857, 862 (5th Cir. 1983) (evidence supported ALJ's determination that nonexertional impairments did not diminish claimant's work capability); Olsen v. Schweiker, 703 F.2d 751, 754-55 (3d Cir. 1983) (ALJ sufficiently considered evidence of all of claimant's impairments); Cummins v. Schweiker, 670 F.2d 81, 84 (7th Cir. 1982) (application of grids proper where substantial evidence supported ALJ's finding that claimant's vision impairment would not interfere with sedentary work of which he was exertionally capable); Kirk v. Secretary of Health & Human Services, 667 F.2d 524, 536-37 (6th Cir. 1981) (substantial evidence supported ALJ's conclusion that "claimant's mental impairments did not significantly limit his work capacity."). Channel, at 583 n.6.

with relation to her use of pain killers and prescription drugs and determine whether or not this pain was a significant nonexertional impairment and whether this impairment significantly narrowed the number of jobs available to the plaintiff.[6]  However, the ALJ's failure to consider anxiety as a significant nonexertional impairment was harmless error, because this Court can "confidently say that no reasonable factfinder, following the correct analysis, could have resolved the factual matter in any other way."  Fischer-Ross v. Barnhart, 431 F.3d 729, 733-34 (10th Cir. 2005).

The ALJ relied on plaintiff's own testimony that her anxiety attacks were "mild."  (R. 33).  In her paperwork filing for disability, plaintiff claimed she was unable to work due to "herniated disks" (R. 40) and "degenerative disc disease."  (R. 47).  There was no record of patient claiming anxiety as an impairment in any of these forms.  Also, plaintiff testified that "[her] back condition limited her to not be able to work" (R. 24) and "all her physical problems were due to her lower back."  (R. 31).  Plaintiff's psychiatric review revealed "impairments not severe."  (R. 233).  The reviewing physician found plaintiff had no functional limitations whatsoever.  (R. 243).  Moreover, the reviewing physician could find "no evidence of treatment for anxiety or other mental health problems in file."  (R. 245).

Also, even though there was evidence of a prescription for anxiety medication in the file, there was no evidence of any treatment for anxiety aside from those prescriptions.  There were no medical opinions that revealed any diagnosis of anxiety that was supported by medically acceptable clinical and laboratory diagnostic techniques in plaintiff's case record.  There were no treatment notes, or anything else that could lead to a reasonable fact finder to conclude that

---

[6]  Absent a specific finding, supported by substantial evidence, that despite her (potential) non-exertional impairments, plaintiff could perform a full range of sedentary work on a sustained basis, it would be improper for the ALJ to conclusively to apply the grids in determining that plaintiff was not disabled.  See Cavitt v. Schweiker, 704 F.2d 1193, 1195 (10th Cir. 1983), et. al.

plaintiff's anxiety was a severe nonexertional impairment or that this alleged impairment significantly narrowed the range of jobs available to the plaintiff. There was only evidence of renewed prescriptions for anxiety medication and fleeting notes that mentioned anxiety as the last of a long list of reasons for plaintiff's doctor visits. (R. 211, 212, 213, 257, 274, 276, 312, 324, 340, et al.). In light of the evidence mentioned above, no reasonable factfinder could conclude that plaintiff's alleged nonexertional impairment of anxiety was significant or would further limit the range of jobs available to the plaintiff and therefore anxiety did not need to be considered by the ALJ before applying the "grids."

Finally, plaintiff argues that neither the ALJ's hypothetical to the vocational expert, nor the RFC determination had any consideration for her mental impairment of anxiety. (Dkt. #15 at 3-4). Plaintiff relies on Stokes v. Astrue in her argument that "once the ALJ finds the claimant has a medically severe impairment, or combination of impairments, he or she is required to "consider the limiting effects of *all* [the claimant's] impairments, even those that are not severe, in determining [the claimant's] residual functional capacity." 274 Fed.Appx. 675, 679 (10th Cir. 2008) (quoting 20 C.F.R. § 1545(e)). In questioning the vocational expert, the ALJ must use the same RFC as he found at Step 4. The ALJ's hypothetical was not incorrect for his failure to include anxiety.

The ALJ determined plaintiff had a severe impairment of degenerative disc disease at Step 2. The ALJ was thus required to consider the *limiting* effects of *all* the plaintiff's impairments in determining plaintiff's RFC. The ALJ considered the claimant's anxiety and applied the proper standards in determining there were no limiting or functional effects.[7] The

---

[7] Under the regulation, when a claimant has a medically determinable mental impairment, it must be evaluated by rating the degree of functional limitation in four broad functional areas: "Activities of daily living; social functioning; concentration, persistence, or pace; and episodes

ALJ found the plaintiff's limitations in daily activity were due to physical problems and that plaintiff had no impairments with restrictions of activities of daily living, no difficulties in maintaining social functioning, and no difficulties in maintaining concentration, persistence, or pace. (R. 13). This finding is supported by the record. (R. 245). Because the ALJ did not accept plaintiff's claim of a limiting condition of anxiety as true, and followed the proper procedures in finding otherwise, the ALJ did not need to set forth the mental impairment of anxiety in the hypothetical question posed to the vocational expert or in his RFC. See Talley v. Sullivan, 908 F.2d 585, 588 (10th Cir. 1990).

## Conclusion

For the foregoing reasons, the Court REMANDS the decision of the Commissioner denying disability benefits for further proceedings consistent with this Order.

SO ORDERED this 21st day of July, 2011.

_____
T. Lane Wilson
United States Magistrate Judge

---

of decompensation." 20 C.F.R. § 404.1520a(c)(3). After rating the degree of functional limitation in each area, the ALJ then determines the severity of the mental impairment. Id. § 404.1520a(d). At the ALJ-hearing level, the ALJ must document application of the technique in the written decision. Id. § 404.1520a(e). Armijo v. Astrue, 385 Fed. Appx. 789 (10th Cir. 2011). The ALJ properly applied this standard. The ALJ documented the technique in the written decision and rated the degree of the functional limitation in each area. (R. 13).